**SUMMONS ISSUED** CV 12 4737

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

——————————————————————————x

ARTURO BECMARTZ,

Plaintiff,

-against-

INTEGRATED MEDICAL PROFESSIONALS,
PLLC, PRESTIGE EMPLOYEE ADMINISTRATORS,
INC., and JEFFREY WEISS, M.D., individually and
as principal of Integrated Medical Professionals, PLLC,

Defendants.

——————————————————————————x

FILED
IN CLERK'S OFFICE
U.S DISTRICT COURT E.D.N.Y.

★ SEP 21 2012 ★

12 CV _____

LONG ISLAND OFFICE

**COMPLAINT AND
JURY TRIAL DEMAND**

SPATT, J.
BROWN, M. J.

Plaintiff, Arturo Becmartz ("Becmartz"), as and for his complaint, by his

undersigned counsel, alleges as follows:

## INTRODUCTION

1. This action seeks to recover at least $1.4 million – representing lost wages

(including both back pay and front pay) and other compensatory damages (including lost

future pecuniary losses as well as non-pecuniary losses for emotional pain, suffering,

inconvenience, mental anguish, humiliation, embarrassment and loss of enjoyment of

life) – together with punitive damages and attorneys' fees for defendants' employment

discrimination against Becmartz based on: (a) Becmartz's race/national origin/ethnicity

and gender, in violation of Title VII (42 U.S.C. section 2000e) and 42 section 1981 and

(b) Becmartz's race/national origin and gender/sexual orientation, in violation of New

York State's Executive Law, section 290 *et seq.*

2. Specifically, from the time Becmartz was hired in 1997 until his termination

on May 7, 2009, defendants – mainly through the actions of defendant Jeffrey Weiss –

subjected Becmartz to an ongoing campaign of discrimination and harassment due to his

1

race/ethnicity (Latino/Hispanic), national origin (Mexican), and gender (male perceived to be gay). Weiss continued this campaign despite Becmartz's repeated complaints to Weiss and others, which Becmartz made especially when Weiss's comments were in front of defendants' patients and/or Becmartz's co-workers).

## PARTIES

3.  Becmartz, who resides at 70 John Lane, Manorville, New York, within the Eastern District of New York, was employed by BiCounty Urological Associates ("BUA") from 1997 through May 7, 2009, as a certified medical ultrasonographer Becmartz also performed services for BUA as a phlebotomist and medical assistant, trained students and other employees and even helped the physicians read and interpret ultrasound films and reports.

4.  From his hiring in 1997 through his termination on May 7, 2009, Becmartz was an "employee" of defendants within the meaning of the federal and state statutes applicable to this complaint.

5.  On information and belief, defendant Integrated Medical Professionals, PLLC ("IMP"), which maintains its place of business at 532 Broad Hollow Road, Melville, New York, within the Eastern District of New York, is the successor in interest to BUA, which became a division of IMP when IMP acquired it in or about 2006.

6.  On information and belief, defendant Prestige Employee Administrators, Inc. ("Prestige"), which maintains its place of business at 538 Broad Hollow Road, Melville, New York, within the Eastern District of New York, is an entity that IMP listed as a "co-employer" of Becmartz.

7.  On information and belief, defendant Jeffrey Weiss, M.D. ("Weiss"), who

resides within the Eastern District of New York, is a urologist who, along with Robert

Mashioff, M.D. ("Mashioff"), at all relevant times has run BUA/IMP's urology practice

in Queens and Nassau County, including its offices in Seaford, New York, within the

Eastern District of New York.

8. Defendants IMP, Prestige and Weiss are "employers" within the meaning of

the federal and state statutes applicable to this complaint.

## JURISDICTION AND VENUE

9. The Court has subject matter jurisdiction over this action pursuant to Title

28 U.S.C. §§1331, 1343(4) and 1367.

10. Venue is proper in this district pursuant to Title 28 U.S.C. §§ 1391.

## FACTS

### *Becmartz's Employment by Defendants*

11. In or about 1981, Becmartz immigrated to the United States from his

native Mexico, where he had been a medical doctor.

12. Because the United States did not recognize the validity of his license to

practice medicine, Becmartz took a job in 1997 as a certified medical ultrasonographer at

the Seaford, New York, office of BUA, the urology practice of Mashioff and Weiss.

13. As part of his employment at BUA, Becmartz also performed services as a

phlebotomist and medical assistant, he trained students and other employees, and even

helped the physicians read and interpret ultrasound films and reports.

### *Defendants Engage in an Ongoing Campaign of Discrimination and Harassment against Becmartz*

14. From the time of Becmartz's hiring until he was terminated on May 7,

2009, BUA – mainly through the actions of Weiss – subjected Becmartz to an ongoing campaign of discrimination and harassment due to his race/ethnicity (Latino/Hispanic), national origin (Mexican), and his gender (male perceived to be gay).

15.     Weiss continued this campaign despite Becmartz's repeated complaints to him.

16.     BUA's campaign of discrimination and harassment included, but was not only limited to, each of the following specific incidents.

### *Defendants Harass Becmartz Because of his Mexican Ethnicity*

17.     Weiss regularly made disparaging remarks about Becmartz's Latino/Mexican heritage in front of employees and patients.  For example:

(a) Weiss frequently told patients that Becmartz was wealthy because Becmartz's family was part of a Latin American drug cartel, that their job was to "get rid of the bodies" and that they are involved in "drug trafficking." [1]

(b) Because it took Becmartz up to four hours round-trip to commute between his home in Manorville and BUA's Queens locations – where BUA occasionally required Becmartz to work – Becmartz asked Weiss to pay for Becmartz's gas and time. Weiss refused, explaining that "your family is so rich making money out of drug dealing that they can afford to pay for it."

(c) Weiss told patients and others that Becmartz had illegal slaves working for Becmartz' at Becmartz's home.  Weiss once asked Becmartz, "Why do you need to take [leftover] food home? Is it for the illegal slaves in the basement?"

(d) When Becmartz once threatened to quit because of the abuse, Weiss

---

[1] Statements in quotation ns do not necessarily represent verbatim quotes but, rather, Becmartz's best current recollection of what was said.

4

responded that Becmartz then could come to Weiss's house with Becmartz's family to cut Weiss's lawn and trim his shrubbery.

(e)  Weiss once said that in front of other employees and an outside pharmaceutical salesman that Becmartz and his family would be doing landscaping because "his type of people are good at that."

(f) Weiss told Becmartz to "Move, you lazy Mexican."

(g) When Becmartz once said that he was feeling tired or sick, Weiss told him to stop complaining and that, "You people are very lazy and too delicate."

(h) Weiss boasted to patients that Becmartz had illegals working at his home.

(i)While Weiss was changing light bulbs in the office hallway, he turned to Becmartz and, in front of patients, announced that he should "hire people like Arturo's race" to do such tasks for him.

(j) On several occasions after the employee lunch break, Weiss say that it was time for Becmartz to take his siesta because his people normally sleep after they eat.

(k) Weiss called Becmartz an "hijo de puta" on several occasions in front of patients and co-workers.  Anyone conversant with Hispanic culture knows that a reference to one's mother, as in "hijo de puta" (literally translated as *son of a whore*), is the ultimate insult.  When Becmartz asked Weiss if he knew how insulting to a Mexican he was being, Weiss's response was, "I know; that is why I am calling you that!"

(l) When a patient (a Mr. Solomon) once refused to permit Becmartz to perform a sonogram after the patient learned that Becmartz was Mexican, Mashioff did not come to Becmartz's defense; instead, he accommodated the patient by arranging for

another employee to perform the test and then waived the co-pay for the patient's "inconvenience."

(m) Weiss ignored Becmartz's repeated requests to stop the abuse. When Becmartz told him that he was damaging Becmartz's reputation, Weiss responded: "You have no reputation; you're a sonographer," and "I am the doctor here, and it is my practice."

(n) Weiss frequently raised his voice to Becmartz, screamed orders at Becmartz and, on several occasions, *even punched Becmartz with a closed fist on the arm or on Becmartz's chest,* leaving Becmartz with black and blue marks that lasted for days. Weiss never engaged in such conduct with other employees.

### *Defendants Harass Becmartz Because of his Gender/Perceived Sexual Orientation*

18.    BUA similarly made disparaging, offensive remarks about Becmartz's gender and perceived sexual orientation. For example:

(a) Dr. Matthew Mene ("Mene"), a doctor at BUA's practice in Seaford, once called Becmartz into his office, closed the door and told Becmartz to take a seat. He started to ask whether Becmartz knew an older gentleman who was very wealthy and was a patient and personal friend of Mashioff. When Becmartz responded that he did know the gentleman in question, Mene proceeded to tell Becmartz that the patient was gay and had asked Mene to go out to dinner with him. Mene then said, "What better person to ask than you: Do I look gay? And why do gay people follow me?" Becmartz responded: "I don't know why you're asking me, but if it makes you feel better, I do not think that you look gay, and if that's all you want then I need to go back to work." Becmartz then left Mene's office.

6

(b) After Weiss performed a medical procedure on Becmartz to alleviate a kidney stone, Weiss told employees on several occasions (in Becmartz's presence): "You should see his penis. It's beautiful" and then continued describing Becmartz's genitals even though Becmartz repeatedly asked him to stop.

(c) On information and belief, Weiss once summoned one of Becmartz's co-workers to Weiss's office and told him that it would be for his benefit and success at BUA/IMP not to talk nor socialize with Becmartz because "you know how those homosexuals are." "And being that Arturo is a homosexual, it's better not to associate with him." Becmartz never discussed his sexual orientation with anyone at the office but, on information and belief, a former employee who knew a friend of Becmartz's from ultrasound school had told Weiss that Becmartz was gay.

(d) On two occasions, Weiss called Becmartz into his office and – while touching his own crotch – told Becmartz that Weiss's wife and children were away and that he was therefore going to be able to "jerk off" in the TV room and kitchen of his home if he wanted to. On each occasion, Becmartz immediately left the office, stating that the topic was not something that concerned him.

(e) Weiss stated publicly on multiple occasions that, "You know how these fags are. . .always complaining."

(f) Karen Gogatz, the office manager, once asked Becmartz to inject vitamin B12 into her buttock. When Becmartz hesitated and asked her why she hadn't asked Weiss or Price, with whom she had closer relationships, to perform the procedure, she responded that she would be embarrassed to show her cellulite "to a man, but with you it's different".

*Defendants Treat Becmartz Less Favorably than BUA's Caucasian Sonographer*

19.    BUA treated Becmartz far less favorably than its other sonographer, Rick Price ("Price"), a Caucasian, Jewish ex-police officer whom Becmartz had trained.  For example:

(a) Becmartz had been working for BUA for five years when Price was hired.  Although BUA had repeatedly rejected Becmartz's requests for a raise, it hired the inexperienced Price at the same salary and with the same benefits as Becmartz was receiving as the more experienced and senior sonographer.

(b) Although Becmartz was required to punch in and punch out every day, Price was never required to do so, and he came and went as he pleased.  When Becmartz complained about Price's preferential treatment to the office manager, Karen Gogatz, she responded that it was none of  Becmartz's business.

(c) Price sometimes arrived at work early, only to watch movies on the office computer, for which time he was paid.  In contrast, despite Becmartz having more than a one-hour daily commute to the office, he was admonished on those rare occasions when he arrived late.  Becmartz was even docked on a few occasions for arriving less than 15 minutes late, usually due to inclement weather or accidents on Sunrise Highway, even when Becmartz called from the road to inform BUA that he would be late.

(d) Price was typically allowed to spend his time in the office surfing the Internet and running his own check-cashing business, while the office manager's assistant told Becmartz that he was not allowed to talk to co-workers and was to stay inside the

sonography room.   Until IMP took over in 2006, Becmartz was not even permitted to take lunch or breaks.

(e)     There were occasions when Price would leave for the day without seeing his last patient and without finishing his responsibilities. He suffered no consequences for such conduct.

(f)     When Price left a mess in an examining room, it was Becmartz's responsibility to clean up after him. When Becmartz complained to the office manager and/or Weiss, the response was always, "clean it and go back to work."

(g)     After 7 years of asking for a desk and a chair where Becmartz could complete all of the sonography studies so as not to be standing for eight hours between the two examining rooms, he was given a small office space in the new location of BUA in Seaford, only to have it taken away from him two months later because it was allegedly needed for another employee.  At that time Becmartz was given a desk with a computer to do his work but, again, it was soon taken away because – according to the office manager, Karen Gogatz, and Weiss – it, too, was allegedly needed by another employee.  In reality, though, Becmartz never saw anyone using that desk again because the employee who was supposed to occupy it was terminated.  Becmartz finally was relocated inside the ultrasound room itself with his computer placed on a shelf in a corner with a high-backed stool.

(h) While Price was given the run of the office, the office manager insisted that Becmartz remain at his corner perch at all times.  When Becmartz complained about this to Weiss, Weiss told Becmartz to keep Weiss out of it since he had given all of the "power" to the office manager.  This put Becmartz in an untenable

position:  Weiss would not acknowledge Becmartz's complaints and would always direct

him to speak to the office manager, who would ignore Becmartz's requests or respond

sarcastically.

        (i)     The office manager (Gogatz) refused to acknowledge Becmartz's

title of physician and would simply say, "I am the office manager and you are going to do

what I tell you to do."  She did not do so in a professional way.

        (j)     On information and belief, BUA paid for Price to train in

California for videourodynamics studies. BUA never offered Becmartz the same

opportunity.

        (k)    During the course of Becmartz's employment following BUA's

hiring of Price, BUA repeatedly reduced Becmartz's hours in favor of Price.  For

example, over the last few months of Becmartz's employment, BUA cut Becmartz's

weekly hours from 35 to 28 to 22 while it increased Price's hours.

        (l)     BUA terminated Becmartz effective May 7, 2009 on the

ground that the position of ultrasonographer would no longer exist because IMP was

insisting *that only physicians conduct such tests*.  But Price was not let go.  To the

contrary, on information and belief he is continuing to perform the very same tests that

Becmartz routinely conducted during his employment.

        (m) On those rare occasions when Becmartz asked to leave early – *e.g.,*

where there were no longer patients in the office or when the weather was extremely

inclement – BUA either denied his requests or allowed him to leave but docked his pay.

This never happened with other employees.

        (n) During his twelve years at IMP/BUA, Becmartz was required to train

ultrasound students for three or four months at a time without any compensation, even

though the sonography school paid BUA for such training and it had never been

mentioned as part of Becmartz's job duties prior to his hiring.  When Becmartz asked

Mashioff and Weiss why Price didn't share this responsibility, the doctors' response was

that "Price does not like to do that, so you will have to do it like it or not."

### *Becmartz's Job Performance was Exemplary*

20.     Neither Becmartz's unfavorable treatment vis a vis Price nor his

termination can be attributed to inferior job performance on Becmartz's part.  To the

contrary, three of the four doctors in the practice gave him enthusiastic recommendation

letters; only Weiss refused to do so..

### *Becmartz's Complaints about BUA's Conduct*

21.  During Becmartz's first seven years of employment at BUA, there was no

formal human resources department to complain to.  When he tried to complain to the

office manager, Gogatz, she made it very clear that since it was the doctors who had hired

him, he should take his complaints to them.  So Becmartz complained on many occasions

to  Weiss, asking him to please stop humiliating Becmartz with his derogatory racial and

sexual remarks.

22.     These complaints fell on deaf ears.  Weiss simply told Becmartz to "Get

over it and don't be so sensitive."  Then, after ignoring Becmartz for a few days, Weiss

would go back to the same routine of harassment, which he seemed to find funny.

23.     Becmartz even went so far as to ask Weiss several times for a letter of

recommendation so that Becmartz could look for another job. Weiss declined, saying

"why do you need a letter of recommendation? You are not going anywhere. You are not leaving me here until I say so."

24. It wasn't until February of 2007 that the doctors – except for Weiss – agreed to give Becmartz recommendation letters. By then, though, being a 50+ year-old man, it would have been difficult for Becmartz to find a new position, especially since – as a foreign physician – he is generally considered over-qualified for most jobs. Consequently, Becmartz attempted to tolerate what was an intolerable situation.

25. Becmartz's fears about being let go and not being able to find another job also made him reluctant in his later years to complain to the human resources department after IMP took over BUA because it was the employees' experience that, "if you complain, they either make your job experience even more miserable or find a way to fire you."

26. Finally, during IMP's investigation of another employee's complaints – after Becmartz had received notice of his termination – Becmartz repeatedly asked to speak with the "investigator," Dawn Scarfa. But when Becmartz finally was allowed to speak to Ms. Scarfa, she immediately interrupted him and rudely told him that he had only five minutes and could talk only about the pending investigation, and not about any problems Becmartz had experienced with Weiss or anyone else.

*Becmartz is Unable to Find Suitable Substitute Employment*

27. Becmartz's concerns about his employability proved to be justified. Despite his ongoing reasonable efforts, since BUA's May 7, 2009, termination of his employment, Becmartz has been unable to find comparable employment.

*The Effects of Defendants' Campaign of Discrimination and Harassment*
*on Becmartz's Health*

28.   Because of BUA's ongoing, escalating campaign of harassment and discrimination against Becmartz, the last 12 years have been an ever-increasing nightmare for him.  He was so emotionally traumatized that, some three years after he began working for BUA, he sought treatment for clinical depression, which continues to this day.   And in 2008, he was diagnosed with gastritis and esophagitis, two stress-induced chronic digestive disorders.

## PROCEDURAL REQUIREMENTS

29.    Becmartz has satisfied all procedural and administrative requirements before commencing this action.

30.    Specifically, Becmartz filed a charge of discrimination with the EEOC in June, 2009.  By determination dated April 18, 2012 (Exhibit A hereto), the EEOC determined that there was reasonable cause to believe that defendants had discriminated against Becmartz on account of his Latino ethnicity and Mexican national origin, and invited the parties to participate in conciliation.  Thereafter, by letter dated June 26, 2012 (Exhibit B hereto), the EEOC advised the parties that conciliation efforts had failed, and it issued a Notice of Suit Rights.

31.   This action is being commenced within 90 days of Becmartz's receipt of the EEOC's Notice of Suit Rights.

## COUNT I
### *(Ethnicity/National Origin Discrimination in Violation of Title VII)*

32.  Becmartz repeats each and every allegation set forth in paragraphs 1-31 above.

33. By engaging in the conduct summarized at paragraph 17 above, defendants created, fostered and tolerated a hostile workplace environment for Becmartz based on his Latino ethnicity and Mexican national origin, thereby discriminating against Becmartz in violation of Title VII.

34.  Becmartz repeatedly notified defendants that he found the workplace environment to be hostile, intimidating and unwelcome, and he repeatedly requested defendants to cease their harassing conduct, to no avail.

35. By engaging in the conduct summarized at paragraph 19 above, and by terminating Becmartz on May 7, 2009, defendants treated Becmartz less favorably than they treated BUA's Caucasian sonographer because of Becmartz's Latino ethnicity and Mexican national origin, thereby discriminating against Becmartz in violation of Title VII.

36. By reason of defendants' unlawful discrimination against Becmartz, as aforesaid, Becmartz is entitled to recover compensatory damages to be determined at trial in at least the sum of $1,399,000, as follows:

(a) $77,000 in back pay.

(b) $222,000 in front pay

(c) $100,000 in other future pecuniary losses

(d) $1,000,000 for emotional pain, suffering, inconvenience, mental anguish and loss of enjoyment of life.

14

37. By reason of defendants' unlawful discrimination against Becmartz, as aforesaid, Becmartz is entitled to recover punitive damages in the maximum amount permitted by law, as well as his reasonable attorneys' fees.

**COUNT II**
***(Racial Discrimination in Violation of 28 U.S.C. section 1981)***

37. Becmartz repeats each and every allegation set forth in paragraphs 1-31 above.

38. By engaging in the conduct summarized at paragraph 17 above, defendants created, fostered and tolerated a hostile workplace environment for Becmartz based on his Hispanic race, thereby discriminating against Becmartz in violation of 28 U.S.C. section 1981.

39. Becmartz repeatedly notified defendants that he found the workplace environment to be hostile, intimidating and unwelcome, and he repeatedly requested defendants to cease their harassing conduct, to no avail.

40. By engaging in the conduct summarized at paragraph 19 above, and by terminating Becmartz on May 7, 2009, defendants treated Becmartz less favorably than they treated BUA's Caucasian sonographer because of Becmartz's Hispanic race, thereby discriminating against Becmartz in violation of 28 U.S.C. section 1981.

41. By reason of defendants' unlawful discrimination against Becmartz, as aforesaid, Becmartz is entitled to recover compensatory damages to be determined at trial in at least the sum of $1,399,000, as follows:

(e) $77,000 in back pay.

(f) $222,000 in front pay.

(g) $100,000 in other future pecuniary losses

(h) $1,000,000 for emotional pain, suffering, inconvenience, mental anguish and loss of enjoyment of life.

42. By reason of defendants' unlawful discrimination against Becmartz, as aforesaid, Becmartz is entitled to recover punitive damages to be determined at trial in at least the sum of $1,000,000, as well as his reasonable attorneys' fees.

**COUNT III**
***(Gender Discrimination in Violation of Title VII)***

43.  Becmartz repeats each and every allegation set forth in paragraphs 1-31 above.

44. By engaging in the conduct summarized at paragraph 18 above, defendants created, fostered and tolerated a hostile workplace environment for Becmartz based on his gender, thereby discriminating against Becmartz in violation of Title VII.

45. Becmartz repeatedly notified defendants that he found the workplace environment to be hostile, intimidating and unwelcome, and he repeatedly requested defendants to cease their harassing conduct, to no avail.

46. By reason of defendants' unlawful discrimination against Becmartz, as aforesaid, Becmartz is entitled to recover compensatory damages to be determined at trial in at least the sum of $1,399,000, as follows:

(i) $77,000 in back pay.

(j) $222,000 in front pay

(k) $100,000 in other future pecuniary losses

(l) $1,000,000 for emotional pain, suffering, inconvenience, mental anguish and loss of enjoyment of life.

47. By reason of defendants' unlawful discrimination against Becmartz, as aforesaid, Becmartz is entitled to recover punitive damages in the maximum amount permitted by law, as well as his reasonable attorneys' fees.

## COUNT IV
### *(Ethnicity/National Origin Discrimination in Violation of NY Executive Law)*

48.   Becmartz repeats each and every allegation set forth in paragraphs 1-31 above.

49. By engaging in the conduct summarized at paragraph 17 above, defendants created, fostered and tolerated a hostile workplace environment for Becmartz based on his Latino ethnicity and Mexican national origin, thereby discriminating against Becmartz in violation of New York Executive Law section 290, *et seq.*

50. Becmartz repeatedly notified defendants that he found the workplace environment to be hostile, intimidating and unwelcome, and he repeatedly requested defendants to cease their harassing conduct, to no avail.

51. By engaging in the conduct summarized at paragraph 19 above, and by terminating Becmartz on May 7, 2009, defendants treated Becmartz less favorably than they treated BUA's Caucasian sonographer because of Becmartz's Latino ethnicity and Mexican national origin, thereby discriminating against Becmartz in violation of New York Executive Law section 290, *et seq.*

52. By reason of defendants' unlawful discrimination against Becmartz, as aforesaid, Becmartz is entitled to recover compensatory damages to be determined at trial in at least the sum of $1,399,000, as follows:

(m)$77,000 in back pay.

(n) $222,000 in front pay

17

(o) $100,000 in other future pecuniary losses

(p) $1,000,000 for emotional pain, suffering, inconvenience, mental anguish and loss of enjoyment of life.

53. By reason of defendants' unlawful discrimination against Becmartz, as aforesaid, Becmartz is entitled to recover punitive damages in the maximum amount permitted by law, as well as his reasonable attorneys' fees.

## COUNT V
### *(Sexual Orientation Discrimination in Violation of NY Executive Law)*

54. Becmartz repeats each and every allegation set forth in paragraphs 1-31 above.

55. By engaging in the conduct summarized at paragraph 18 above, defendants created, fostered and tolerated a hostile workplace environment for Becmartz based on his actual or perceived sexual orientation, thereby discriminating against Becmartz in violation of New York Executive Law sections 290, *et seq.* (SONDA).

56. Becmartz repeatedly notified defendants that he found the workplace environment to be hostile, intimidating and unwelcome, and he repeatedly requested defendants to cease their harassing conduct, to no avail.

57. By engaging in the conduct summarized at paragraph 18 above, and by terminating Becmartz on May 7, 2009, defendants treated Becmartz less favorably than they treated BUA's Caucasian sonographer because of Becmartz's actual or perceived sexual orientation, thereby discriminating against Becmartz in violation of New York Executive Law section 290, *et seq.* (SONDA).

58. By reason of defendants' unlawful discrimination against Becmartz, as

aforesaid, Becmartz is entitled to recover compensatory damages to be determined at trial in at least the sum of $1,399,000, as follows:

(q) $77,000 in back pay.

(r) $222,000 in front pay

(s) $100,000 in other future pecuniary losses

(t) $1,000,000 for emotional pain, suffering, inconvenience, mental anguish and loss of enjoyment of life.

59. By reason of defendants' unlawful discrimination against Becmartz, as aforesaid, Becmartz is entitled to recover punitive damages in the maximum amount permitted by law, as well as his reasonable attorneys' fees.

## COUNT VI
### (*Fraud/Negligent Misrepresentation*)

60. While employed by defendants, Becmartz had taken an $8,000 loan against his 401K account, which loan was being paid off through deductions from his bi-weekly pay check. At the time of his termination, the outstanding amount of the loan was $6,258.73.

61. Upon his termination, Becmartz called a Fortuna at defendant Prestige to inquire how to pay off the balance of the loan.

62. Fortuna advised Becmartz that he need not take any action, and that Prestige would handle everything. Specifically, she explained that, at the end of the year (2009), the balance of the loan simply would be deducted from the principal sum of his 401K account, that he would be responsible for paying taxes on that amount, and that he then had the option of rolling over the balance of his account to another investment.

63. During this phone call, Becmartz asked Fortuna if there were any other

options because he did not want to have to pay taxes on a loan re-payment. She responded with words to the effect that "this is the way it is done" and that she would take care of it. Becmartz was not asked to sign any documents with respect to the matter.

64. Mr. Becmartz subsequently learned that, in addition to having to pay taxes on the $6,258.73, he would also be required to pay a 10% penalty on the sum because it was considered an early withdrawal from the 401K. According to an accountant whom Becmartz consulted, Prestige should have explained the penalty and given Becmartz the option of paying the loan out-of-pocket to avoid taxes and penalty.

65. Becmartz thereafter spoke with a Michelle of Prestige (who, on information and belief, had replaced Fortuna) in an effort to resolve the issue. Michelle acknowledged that Fortuna should have explained the penalty to him or, at least, furnished him a writing laying out his options. According to Michelle, Fortuna's failure to do such things "is the reason why she is no longer working with us." Michelle even initially suggested that, due to its error, Prestige should reimburse Mr. Becmartz for the penalty he incurred. However, she later informed him that Prestige/IMP had decided that it was not obligated to do so.

66. The information that Prestige furnished Becmartz was false when made, and Prestige knew, or should have known that such information was incorrect and that Becmartz would rely on it to his detriment.

67. Becmartz had no knowledge that Prestige's information was incorrect, and he reasonably relied on the information to his detriment by following Prestige's instructions, resulting in financial loss and penalty to him, together with interest thereon.

68. By reason of the foregoing, Becmartz is entitled to recover damages from

defendants in an amount to be determined at trial, representing the taxes and penalty that Becmartz incurred as a result of relying on the information that Prestige provided him,

WHEREFORE, Becmartz prays that this Court grant judgment to him containing the following relief:

(a) An award of Becmartz's actual damages in an amount to be determined at trial not less than $399,000 for lost wages, benefits and promotional opportunities, including an award of front pay to compensate Becmartz for loss of future salary, benefits and opportunities.

(b) An award of damages to be determined at trial not less than $1,000,000 to compensate Becmartz for his emotional pain, suffering, inconvenience, mental anguish, humiliation, embarrassment and loss of enjoyment of life.

(c) An award of punitive damages.

(d) An order enjoining defendants from engaging in the unlawful discriminatory practices alleged herein.

(e) With respect to Count V, an award of damages in an amount to be determined at trial, representing the taxes and penalty that Becmartz incurred as a result of relying on the information that Prestige provided him, together with interest thereon.

(f) An award of Becmartz's reasonable attorneys' fees and the costs and expenses of this action.

(g) Such other and further relief as this Court may deem just and proper

## JURY DEMAND

Becmartz hereby demands a jury trial for each and every claim set forth in this complaint.

Dated:  Melville, New York
September 21, 2012

Roy A. Klein
Attorney for Plaintiff
532 Broad Hollow Road
Melville, New York 11747
631-777-1313

# Exhibit A
# to Becmartz Complaint
# (EEOC's Determination)



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
For General Information: (800) 669-4000
TTY: (800)-669-6820
District Office: (212) 336-3630
General FAX: (212) 336-3625

EEOC CHARGE NO: 520-2009-03678

| | |
|---|---|
| Arturo Becmartz<br>70 John Lane<br>Manorville, NY  11949 | Charging Party |
| Roy A. Klein<br>532 Broad Hallow Road, Suite 144<br>Melville, NY 11747 | Charging Party's Attorney |
| Integrated Medical Professional, PLLC<br>532 Broad Hallow Road, Suite 142<br>Melville, NY 11747 | Respondent |
| Joshua Marcus<br>Franklin, Gringer & Cohen, P.C.<br>Attorneys at Law<br>666 Old Country Road, Suite 202<br>Garden City, NY 11530-2013 | Respondent's Attorney |

## DETERMINATION

On behalf of the U.S. Equal Employment Opportunity Commission ("Commission"), I issue the following determination on the merits of the subject charge filed under the Title VII of the Civil Rights Act of 1964, as amended.  Respondent is an employer within the meaning of the Act.  All requirements for coverage have been met.

Charging Party alleges that during his employment as a medical ultrasonographer at Respondent medical practice he was subjected to discrimination and harassment on account of his ethnicity (Latino), national origin (Mexican), and gender (male).  Specifically, he charges that he was the victim of Respondent executive's repeated ethnic slurs, often in the presence of patients and staff, that the terms and conditions of his employment were inferior to those of his non-Hispanic co-worker, that Respondent managers refused to respond to his complaints about his treatment, and that he was terminated on the pretext that his services were no longer needed, while his non-Hispanic co-worker was retained.  Charging Party's co-worker was permitted to manage his private business during office hours and on office equipment, was given a designated office space, was not docked for arriving late, and received other preferential treatment from Respondent executives and the office manager.

Charging Party alleges that he was discriminated against on account of his gender because Respondent officials regarded him as homosexual, uttering demeaning remarks and insulting stereotypes directly to him and to his co-workers and to patients about him.

With respect to the ethnic slurs, Charging Party asserts that he was repeatedly characterized as a member of a family drug cartel and a "hijo de puta" (son of a whore). The executive suggested that Charging Party come to his home to cut his lawn and do his bushes. When the Charging Party finally complained of his mistreatment to the executive and to the office manager, no investigation was conducted, and he was admonished to "get over it," according to the charge. Charging Party was dismissed with the explanation that doctors would henceforth be doing all sonograms but in fact his non-Hispanic co-worker was retained to conduct all sonograms, according to the charge.

Respondent denies discriminating against Charging Party. In its position statement, Respondent asserts that Charging Party was an hourly employee and his co-worker comparator was salaried because of the needs of the firm to cover different offices and the employees' preferences as to where they would work. Respondent denies that Charging Party was subject to different and inferior terms and conditions of employment, although Respondent admits that the co-worker was permitted to carry out certain functions of his private business during office hours. Respondent also denies that Charging Party made complaints about mistreatment.

Respondent defends its termination of Charging Party as non-discriminatory, asserting that, when it was decided that doctors would perform sonograms, Charging Party expressed no interest in other tasks, while his co-worker was willing to do medical assistant and administrative duties and was more flexible as to location.

With respect to the ethnic slurs, Respondent denies that any of the purported comments were made, citing as evidence the fact that Charging Party did not complain about them.

In a detailed rebuttal of the position statement, Charging Party re-asserts his claims as to an abusive and hostile work environment with respect to his national origin. Signed witness statements attest to the ethnic epithets and degrading comments made by Respondent executives and heard by co-workers, and attest to Charging Party's rebuffed protests. There is also credible evidence that Charging Party's non-Hispanic co-worker was treated preferentially as to terms and conditions of employment and termination.

Based on the above, Respondent's asserted defense does not withstand scrutiny and the Commission has determined that there is reasonable cause to believe that Respondent has discriminated against Charging Party on account of his ethnicity (Latino) and national origin (Mexican). The Commission makes no finding as to gender discrimination and Respondent's alleged perception as to Charging Party's sexual orientation.

This determination is final. Title VII of the Civil Rights Act of 1964, as amended requires that, if the Commission determines that there is reasonable cause to believe that violations have occurred, it shall endeavor to eliminate the alleged unlawful employment practice by informal methods of conference, conciliation and persuasion. Therefore, the Commission now invites the parties to join with it in an effort toward a just resolution of this matter. Enclosed is a letter outlining the proposed terms of conciliation.

Disclosure of information obtained by the Commission during the conciliation process may only be made in accordance with Title VII of the Civil Rights Act of 1964, as amended and the

Commission's Procedural Regulations. The confidentiality of Sections 706 and 709 of Title VII and Commission Regulations apply to information obtained during the conciliation.

If Respondent declines to enter into conciliation discussions, or when the Commission's representative is unable to secure an acceptable conciliation agreement, the Director shall so inform the parties, advising them of the court enforcement alternatives available to aggrieved persons and the Commission.

On behalf of the Commission:

Kevin J. Berry
District Director

Date    4/19/12

# Exhibit B
# to Becmartz Complaint
# (EEOC's Notice of Suit Rights)



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5ᵗʰ Floor
New York, NY 10004-2112
(212) 336-3620
TTY (212) 336-3622
General FAX (212) 336-3625


**Arturo Becmartz**
**70 John Lane**
**Manorville, NY 11949**

Re:   Arturo Becmartz v. Integrated Medical Professional, PLLC
      **Charge No:** 520-2009-03678

Dear Mr. Becmartz:

The Commission has determined and this correspondence is to advise you that
conciliation efforts in the above referenced charge of employment discrimination have
failed.

Enclosed is your Notice of Right to Sue.

Sincerely,

6/26/12
DATE

Kevin J. Berry
District Director

cc: Roy A. Klein
    532 Broad Hallow Road, Suite 144
    Melville, NY 11747

EEOC Form 161-A (11/09)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

# NOTICE OF RIGHT TO SUE
### *(CONCILIATION FAILURE)*

| | |
|---|---|
| To: **Arturo Becmartz**<br>**70 John Lane**<br>**Manorville, NY 11949** | From: **New York District Office**<br>**33 Whitehall Street**<br>**5th Floor**<br>**New York, NY 10004** |

| | |
|---|---|
| ☐ | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **520-2009-03678** | **Debra L. Curry,**<br>**Investigator** | **(212) 336-3768** |

### TO THE PERSON AGGRIEVED:

This notice concludes the EEOC's processing of the above-numbered charge. The EEOC found reasonable cause to believe that violations of the statute(s) occurred with respect to some or all of the matters alleged in the charge but could not obtain a settlement with the Respondent that would provide relief for you. In addition, the EEOC has decided that it will not bring suit against the Respondent at this time based on this charge and will close its file in this case. This does not mean that the EEOC is certifying that the Respondent is in compliance with the law, or that the EEOC will not sue the Respondent later or intervene later in your lawsuit if you decide to sue on your own behalf.

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)

**Kevin J. Berry,**
**District Director**

6/26/12
*(Date Mailed)*

cc:

**INTEGRATED MEDICAL PROFESSIONALS, PLLC**
**532 Broad Hallow Road, Suite 142**
**Melville, NY 11747**

**Roy A. Klein**
**532 Broad Hallow Road, Suite 144**
**Melville, NY 11747**